FILED

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# WESTERN DIVISION

99 APR -7  PM 2: 07

U.S. DISTRICT COURT
N.D. OF ALABAMA

JOE F. MCGEE and WILLICE
LASHLEY,

     Plaintiffs,

vs.

UNITED STATES DEPARTMENT OF
AGRICULTURE, et al.,

     Defendants.

]
]
]
]
]
]
]
]
]
]
]

CV 97-N-2335-W

ENTERED

APR 0 7 1999

## Memorandum of Opinion

In this action, plaintiffs Joe McGee and Willice Lashley seek review of a final agency

action and assert claims against the federal defendants pursuant to the Constitution of the

United States,[1] 42 U.S.C. § 1981, 42 U.S.C. § 1985(3), the Administrative Procedure Act

(APA), and Alabama law. The defendants include the United States Department of

Agriculture, the Farm Services Agency, and eight officials of the Farm Services Agency.

Plaintiffs allege, in brief, that the defendants conspired to remove them from their elected

positions on the Farm Services Agency County Committee for Greene County, Alabama,

because of their race and for exercising their right to free speech. The matter is presently

before the court on a motion to dismiss and/or motion for summary judgment and/or for

administrative review filed by the defendants on March 2, 1998.[2] The motion has been fully

---

[1] Plaintiffs' constitutional claims are asserted under the authority of *Bivens v. Six Unknown Federal Narcotics Agents,* 403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971).

[2] Though not entirely clear from the motion, the government has in effect moved this court to affirm the administrative determination and to dismiss any remaining claims. See discussion *infra* at section II.



49

briefed by the parties and the court has reviewed the administrative record from the U.S. Department of Agriculture. Upon due consideration, defendant's motion for summary judgment will be granted in part and denied in part.

## I.  Facts[3]

The court will begin with a brief overview of the regulatory scheme which gave rise to this controversy.[4] The United States Department of Agriculture (USDA) is an executive agency whose many responsibilities include implementing certain federal farm programs. These programs are financed by the Commodity Credit Corporation but are administered on a day-to-day basis by the USDA's Agricultural Stabilization and Conservation Service (ASCS).[5] The Secretary of Agriculture utilizes "county committees"—composed of local farmers elected by other farm producers in the area—to help the ASCS implement and enforce USDA programs. These committees are overseen by a state committee, which consists of three to five farmers who reside in the state and are appointed by the Secretary of Agriculture. Finally, the Secretary monitors the operation of the committee system

---

[3] In developing the statement of facts in this opinion, the court considered the facts proposed by the parties and the court's own examination of the evidentiary record. These are the "facts" for purposes of this opinion only. They may not be the actual facts. *Cox v. Administrator U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994), *cert. denied*, *USX Corp. v. Cox*, 114 S. Ct. 900 (1995).

[4] The court approaches the examination of any USDA program with more than a modicum of fear and trepidation. As the 10th Circuit has remarked about another program administered by the USDA, the agency's regulatory schemes seem to "epitomize bureaucratic muddle." *Olenhouse v. Commodity Credit Corporation*, 42 F.3d 1560, 1566 (10th Cir. 1994).

[5] Pursuant to the Federal Crop Insurance Reform and Department of Agriculture Reorganization Act of 1994, 7 U.S.C. §§ 201-306, the responsibilities of the ASCS have now been assumed by the Farm Service Agency (FSA). *See generally* Alan R. Malasky & William E. Penn, *USDA Reorganization—Fact or Fiction?*, 26 U. Mem. L. Rev. 1161 (1995). In order to ensure that no one emerges from this experience with a clear head, the court will refer to the agencies interchangeably throughout this opinion.

through the Administrator of ASCS and the Deputy Administrator for State and County Operations. 7 C.F.R. § 7.21.

ASCS county employees have employment rights that are more limited than those available to civil service employees subject to the Civil Service Reform Act (CSRA) of 1978. Although Congress has conferred upon ASCS county employees some of the rights held by civil service employees under the CSRA, *see, e.g.,* 5 U.S.C. §§ 5595(a)(2)(b) (severance pay), 8331(1)(F) (participation in the Civil Service Retirement System), 8701(a)(8) (life insurance benefits), and 8901(1)(G) (health insurance benefits), the CSRA does not govern personnel actions against them.

Members of the county committees are neither civil service employees nor ASCS county employees; instead, their tenure is authorized by 16 U.S.C. § 590h. The administrative procedures relevant to personnel actions against them, promulgated pursuant to 16 U.S.C. §§ 590d(3) and 590h(b), provide that a county committee member may be suspended and removed for cause. Under the regulations, a suspended county committee member must be given a written statement of the reasons for the suspension. If dissatisfied, he may appeal the suspension to the ASCS Deputy Administrator for State and County Operations. 7 C.F.R. § 7.30. The county member is entitled to a hearing conducted by the Deputy Administrator or a designated hearing officer, at which the committee member may appear personally or through a representative. 7 C.F.R. § 7.31. At the hearing, both the committee member and the agency may call and cross-examine witnesses, and the testimony is transcribed. Within 60 days of receiving the transcript, the hearing officer must transmit to the Deputy Administrator a record of the hearing, the findings and analysis,

3

and a recommendation. 7 C.F.R. § 7.32. When the Deputy Administrator makes his final decision, he must set forth the basis for his determination. 7 C.F.R. § 7.33. If dissatisfied, the county employee may seek reconsideration by the Deputy Administrator. 7 C.F.R. § 7.30. The final decision of the Deputy Administrator constitutes final agency action and is subject only to judicial review. 7 C.F.R. § 7.33.

Among the programs administered by the USDA and ASCS is the Disaster Assistance Program, which provides qualifying farmers with cash payments for crop losses caused by natural disasters. Farmers who apply for disaster assistance payments must demonstrate that they have followed accepted farming practices and have made an effort to produce a crop. Applications for disaster assistance are considered initially by the county committee, which can accept the application, reject it, or reduce the amount provided to the producer. Farmers who are dissatisfied with the ruling they receive from the county committee may appeal the decision to the county committee and then to the FSA State Executive Committee.

Plaintiffs Joe McGee and Willice Lashley are white farmers in Greene County, Alabama. They were elected by the farmers of Greene County to successive terms of office on the Greene County Committee (COC). As committee members, they received $10.61 an hour for time spent attending monthly county committee meetings and were reimbursed for travel to and from the meetings. One of plaintiffs' responsibilities as committee members was helping to administer the USDA's Disaster Assistance Program. Specifically, COC members were charged with making determinations regarding disaster assistance applications from farmers within their jurisdiction.

4

In 1994, a black farmer in Greene County named George Hall submitted multiple applications for disaster assistance payments which totaled $8,392. Hall had applied for and received disaster assistance for at least the previous four years. On March 14, 1995, the Greene County Committee considered applications for disaster assistance for the 1994 crop year. The committee approved applications from ten white farmers and five black farmers (including Hall), but denied some of Hall's applications. The County Committee denied Hall's applications because it found that there was no evidence of cultivation or herbicide use on Hall's sweet potato, watermelon, and peanut crops, and that an insufficient amount of nitrogen was applied to his hay crop. At the meeting, the County Agent, Jerry Clark, advised the COC members that their determinations complied with all applicable USDA regulations, and the Minority Advisor, Lucious Morrow, supported the committee's actions. Mary McInnis, the County Executive Director (CED), testified later that she told the COC that its decision with regard to Hall's application was not in accordance with USDA regulations, but her objection is not noted in the minutes of the meeting. Hall filed an appeal with the county committee.

The appeal was heard by the Greene County Committee on April 18, 1995. At that meeting, the committee reversed its prior decision and partially approved some of Hall's applications, but also reduced Hall's yield premiums because of his farming practices. As a result, Hall received $6,241 of the $8,392 he originally requested. FSA District Director Robert Burge, present at the meeting at the request of Robert Springer, the State Executive Director (SED), expressly advised the county committee that its actions with regard to Hall's applications were appropriate.

5

At the same meeting at which it heard Hall's appeal the COC reduced the disaster relief claim of a white cattle producer, Reynolds Cattle Company, by fifty (50) per cent.

Subsequent to the April 1995 meeting, Hall appealed the county committee's decision to the FSA State Executive Committee and filed a race discrimination complaint against the members of the COC. In response, SED Springer asked Dorothy Roberts, a USDA/FSA employee, to conduct a review of the Greene County Committee's treatment of disaster assistance applications for the 1994 crop year. There is some dispute as to whether Roberts was told that a claim of discrimination had been made, but it is clear that Roberts was not aware of which producer was making a complaint. Roberts' report, which was submitted on April 28, 1995, found only a few instances of technical noncompliance with USDA regulations, none of which involved the applications of George Hall. Roberts informed the Greene County Committee of her findings on May 5, 1995.

Hall's appeal was heard by the FSA State Executive Committee on June 23, 1995. After hearing from Hall and Chief Agricultural Program Specialist Daniel Robinson and reviewing the minutes of the Greene County Committee meetings, the state committee voted to reverse the county committee and fully restore Hall's disaster assistance payments. The state committee based its decision primarily on its view that Hall's farming practices were acceptable and did not justify reduction of his yield payments.

During the fall of 1995, John Dumas, an FSA District Director in Georgia, was asked to review the Greene County Committee's decisions on disaster assistance for the 1994 crop year—an evaluation that was similar to, if not identical to, the one conducted by Dorothy Roberts in April. It is unclear from the record who ordered Dumas' investigation.

Dumas reported on October 23, 1995, that Hall had been treated differently from all the other farmers, both black and white; in particular, Dumas found that the County Committee did not question the use of herbicides or cultivation for any other 1994 disaster applicant.[6] SED Springer interpreted this report as a finding of discrimination, and ordered a third review of the disaster assistance payments by Mike McCann, the Washington Director of Operations Analysis, to resolve the inconsistencies between the Roberts and Dumas reports. In a verbal report to Springer, McCann apparently conveyed his opinion that while it appeared that Hall was treated unlike any other farmer in Greene County, it was unclear whether the discrimination was based on race.

On December 20, 1995, USDA Investigator Willie Cook issued a report based on his inquiry into Hall's complaint of discrimination. In the report, Cook found racial discrimination on the part of the Greene County Committee and recommended that the committee be removed from office. He based this determination on findings that the COC's stated reasons for denying benefits to Hall were invalid, the bases for denial were inconsistently applied to Hall, and heavy rains in Alabama during 1994 contributed generally to disastrous conditions across the county. (Farm Services Agency Record at 154-55).

In June of 1996, SED Springer and defendant John Stencel, Deputy Administrator for Program Delivery and Field Operations of the FSA, asked Jean Freeman of the USDA Office of Civil Rights Enforcement to conduct a further investigation of Hall's allegations of racial discrimination. Among the evidence gathered by Freeman were the minutes of an executive

---

[6] Dumas also erroneously reported that the COC had approved all disaster applications filed by white farmers, overlooking the fact that it had reduced the claim of Reynolds Cattle Company, a white owned operation, for half.

session with the Greene County COC; a Data Review prepared by Civil Rights and Small Business Development staff; and statements from the FSA County Executive Director for Greene/Sumter County, Mary McInnis; FSA District Director Richard Burge; Debra Burch, JoAnne Carpenter, and Gayle Fincher, Program Assistants in the Greene/Sumter County FSA office; Harry and Donald Means and Lucius Morrow, Sr., black farmers in Greene County; a Greene County Commissioner, William Roberson; and Willie Nixon, farmer and President of the Greene County Self Farmers Co-op (Farm Services Agency Record at 185-203).

On August 9, 1996, a final decision on Hall's complaint was issued by Wardell Townsend, Assistant Secretary for Administration. In the decision, Townsend found that Hall had stated a *prima facie* case of racial discrimination because he was treated less favorably than similarly situated white farmers by the County Committee with regard to the reduction of his disaster payments based on his farming practices. Hall's application for disaster relief was the only one denied for that year. Townsend also found that the inference of discrimination was "strengthened by the lack of a legitimate reason for denying the complainant disaster benefits, the hostile racial environment that appears to exist in the area, the approval of hay losses for white farmers who did not fertilize, and the racially charged comments." (Farm Services Agency Record at 107). The evidence of a hostile racial environment in the area consisted of vandalism of black churches and a later shooting into the home of a black judge. The racially charged comments noted in the decision were found during the Freeman investigation and included a reference by one of the County Committee members to a black county commissioner as a "boy" and statements by a COC

8

member that a predominately black community was a "baby factory" and that black citizens

could not effectively handle financial matters.

Townsend also rejected the COC's articulated reasons for denying disaster relief

benefits to Hall because they were inconsistently applied to white farmers. Finally, he

stated:

> Having found no legitimate reason for the denial, we conclude that the racial
> environment in the area and the white farmers' unimpeded acquisition of
> benefits is sufficient to establish a racially biased motive for the treatment of
> the complainant. The statements by the CC member clearly show that black
> citizens were negatively stereotyped. Therefore, we find that the CC
> discriminated against the complainant on the basis of race, when his disaster
> applications were denied.

(Farm Services Agency Record at 108). Townsend recommended that "any corrective

actions will be directed at ensuring such discrimination is not repeated." (Farm Services

Agency Record at 109).

Plaintiffs were suspended from their positions by the Alabama State FSA Office on

August 20, 1996. In a letter, the State Committee stated that "[y]ou treated the Complainant

less favorably than similarly situated white farmers. Further, the reasons for your denial of

the Complainant's applications were found not to be credible. Your decision to deny

payments to the Complainant is wholly inconsistent with the decisions made on other

applications." (Farm Services Agency Record at 31-32). A copy of the Townsend decision

was attached to the letter. Plaintiffs' appeal of their suspension to the State Committee was

denied on December 3, 1996, and plaintiffs were permanently barred from future service

and employment as FSA Committee members or employees of an FSA County Committee.

9

Plaintiffs' final appeal was to the Deputy Administrator for Program Delivery and Field Operations of the FSA. On February 12, 1997, plaintiffs received a hearing before John W. Chott, Jr., the Assistant to Deputy Administrator for Program Delivery and Field Operations. In an opinion dated June 23, 1997, Chott recommended that plaintiffs' removal from office be sustained and that the bar to future service remain. Chott based his findings on the written submissions of the agency and plaintiffs and on testimony presented at the hearing. Although he found that the decision by Wardell Townsend was severely flawed in certain respects,[7] Chott also found that the agency had demonstrated by a preponderance of the evidence that plaintiff McGee had told CED McInnis that when black people don't get their way they "holler discrimination," that McGee had referred to a local, mostly black housing project as a "baby factory," that two white hay farmers who applied no fertilizer received no reduction in their disaster payments, that Hall was accorded treatment different from that accorded other farmers, white and black, and that there was no legitimate explanation for the way the reductions to Hall's benefits were calculated. (Chott recommendation at 8-12). Stated succinctly, Chott found that:

Although the Greene COC had other motives—improper, but not racial—in denying and then approving but reducing disaster payments to producer Hall, their articulated reasons are without legitimate explanation, and their rationale for the percentage reductions used in determining Hall's payments are fatuous . . . . Further, at least two similarly situated white hay farmers received full disaster payments. Hall was treated disparately by the Greene COC without a legitimate explanation and, given the racial comments by COC member McGee, I find that the COC decision on Mr. Hall is racially tainted.

---

[7] For example, Chott specifically found that Townsend's reliance on an atmosphere of criminal racial hostility in Greene County was inappropriate. (Chott recommendation at 9-10).

10

(Chott recommendation at 15). In addition, Chott considered and found unpersuasive the affirmative defenses offered by plaintiffs. By letter dated June 26, 1997, John Stencel, Deputy Administrator for Program Delivery and Field Operations, accepted Chott's recommended decision.

After receiving a final agency decision from Deputy Administrator Stencel, plaintiffs brought suit in federal court. In their complaint, plaintiffs allege that the decision to remove them from office was arbitrary, capricious, an abuse of discretion, and contrary to their constitutional rights under the Administrative Procedure Act, denied them their rights under 42 U.S.C. § 1981, constituted a conspiracy to deprive them of their civil rights as prohibited by 42 U.S.C. § 1985(3), violated their constitutional rights to equal protection, due process, and freedom of speech, and defamed them under Alabama law. Plaintiffs seek reinstatement, back pay, compensatory damages, punitive damages, and attorneys' fees.

## II.    Standard of Review

Since the plaintiffs assert claims under the Administrative Procedure Act and various civil rights laws, the court's consideration of those claims will necessarily employ divergent standards of review. Insofar as plaintiffs seek review of an agency decision under 5 U.S.C. § 706(2)(A), the court is limited to determining whether the decision was arbitrary, capricious, and an abuse of discretion, or otherwise not in accordance with the law. 5 U.S.C. § 706(2)(A); *Camp v. Pitts*, 411 U.S. 138, 142 (1973); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971). This analysis is entirely appropriate at this stage of the proceedings, since the court's review is limited to the evidence contained in the administrative record.

11

In a case such as this, however, the court must also determine whether the agency's decision infringed right, power, privilege, or immunity provided plaintiffs under the Constitution of the United States. 5 U.S.C. § 706(2)(B); *Porter v. Califano*, 592 F.2d 770, 780 (5th Cir.1979);[8] *Citizens to Preserve Overton Park,* 401 U.S. at 413-14. A constitutional assessment of agency action is not limited to the evidence contained in the administrative record. *See Califano,* 592 F.2d at 780 ("The intent of Congress in 5 U.S.C. § 706(2)(B) was that courts should make an independent assessment of a citizen's claim of constitutional right when reviewing agency decision-making"); *Stupak-Thrall v. United States,* 70 F.3d 881 (6th Cir. 1995) ("The constitutionality of an agency's action is subject to plenary review"), *rev'd on other grounds,* 89 F.3d 1269 (6th Cir. 1996) (en banc); *see also Beerly v. Department of Treasury*, 768 F.2d 942, 948 (7th Cir. 1985); *Rydeen v. Quigg,* 748 F. Supp. 900, 905 n.8 (D.D.C. 1990); *Coleman v. Block,* 663 F. Supp. 1315, 1329-30 (D.N.D. 1987), *vacated as moot,* 864 F.2d 604 (8th Cir. 1988). This question quite obviously cannot be decided on the basis of the administrative record alone. Accordingly, the court will defer review of the agency decision under 5 U.S.C. § 706(2)(B) until further discovery has been completed.

At this stage in the proceedings, the court will consider plaintiffs' claims under 42 U.S.C. §§ 1981 and 1985(3) according to the standard applied to a motion to dismiss. Although defendants have labeled their motion, at least in part, a motion for summary judgment and submitted some evidence (most notably the administrative record), such a

---

[8] The decisions of the former Fifth Circuit are binding upon this court. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981)

motion is inappropriate at this stage in the proceedings as the parties have not engaged in meaningful discovery and the court will be deciding purely legal issues. *See Miller v. USDA Farm Services Agency,* 966 F. Supp. 1087, 1088 (N.D. Ala. 1997) (Hancock, J.), *aff'd,* 143 F.3d 1413 (11th Cir. 1998). In addition, the motion arose out of this court's order of February 9, 1998, which directed the defendants to file a "motion to dismiss/strike all claims that are non-APA review" and it is clear from the briefs submitted by the parties that the defendants intended their motion to be construed as a motion to dismiss with regard to the civil rights claims. A motion to dismiss should be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S. Ct. 99, 101-02, 2 L. Ed. 2d 80 (1957) (citations omitted). The court must take factual allegations as true and resolve any ambiguities or doubts regarding the sufficiency of the claim in favor of the plaintiff. *In re Johannessen,* 76 F.3d 347, 350 (11th Cir. 1996). A complaint should be dismissed, however, if it is clear that no relief could be granted even if the plaintiffs' factual allegations are credited as true. *See id.* at 349.

## III.    Discussion

### A.    Plaintiffs' *Bivens* Action

Plaintiffs seek to state constitutional claims under the authority of *Bivens v. Six Unknown Federal Narcotics Agents,* 403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971). In *Bivens,* the Supreme Court recognized an implied federal cause of action for money damages against individual federal officers who are claimed to have violated the Fourth Amendment. Finding that Congress had not made an "explicit declaration that persons [so]

13

injured . . . may not recover money damages . . . but must instead be remitted to another remedy, equally effective in the view of Congress," and that "no special factors counsel[ed] hesitation in the absence of affirmative action by Congress," the Court stated that "'where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done.'" *Bivens,* 403 U.S. at 396-97.

In subsequent decisions, the *Bivens* reasoning has been applied to cases alleging violations of the Due Process Clause of the Fifth Amendment, *Davis v. Passman,* 442 U.S. 228, 99 S. Ct. 2264, 60 L. Ed. 2d 846 (1979), and the Cruel and Unusual Punishments Clause of the Eighth Amendment, *Carlson v. Green,* 446 U.S. 14, 100 S. Ct. 1468, 64 L. Ed. 2d 15 (1980). However, the Court's "more recent decisions have responded cautiously to suggestions that *Bivens* remedies be extended into new contexts." *Schweiker v. Chilicky,* 487 U.S. 412, 421, 109 S. Ct. 2460, 2467, 101 L. Ed. 2d 370 (1988). In *Chappell v. Wallace,* 462 U.S. 296, 103 S. Ct. 2362, 76 L. Ed. 2d 586 (1983), the Court refused to allow a *Bivens* action by military personnel who alleged that they had been injured by the unconstitutional actions of their superior officers, even though the plaintiffs had no other remedy against the government. The court held that the disciplinary structure of the military and Congress' authority over the military system of justice constituted "special factors" militating against the availability of a *Bivens*-type remedy. *Chappell*, 462 U.S. at 304; *see also United States v. Stanley,* 483 U.S. 669, 107 S. Ct. 3054, 97 L. Ed. 2d 550 (1987). In a case that is more similar to the present controversy, the Court refused unanimously to create a *Bivens* action for a federal employee claiming a First Amendment violation "aris[ing] out of an employment

14

relationship that is governed by comprehensive procedural and substantive provisions giving meaningful remedies against the United States." *Bush v. Lucas,* 462 U.S. 367, 368, 103 S. Ct. 2404, 2406, 76 L. Ed. 2d 648 (1983). Significantly, the *Bush* Court refused to recognize a *Bivens* remedy even though it acknowledged that "existing remedies do not provide complete relief for the plaintiff." *Bush,* 462 U.S. at 388. As the Court in *Schweiker* recognized, "the concept of 'special factors counselling hesitation in the absence of affirmative action by Congress' has proved to include an appropriate judicial deference to indications that congressional inaction has not been inadvertent." *Schweiker,* 487 U.S. at 423.

Just last year, the Eleventh Circuit ruled that a federal employee of the USDA Farm Services Agency was precluded from bringing a *Bivens* action for money damages in light of the employee's right to judicial review under the Administrative Procedure Act. *Miller v. U.S. Department of Agriculture Farm Services Agency,* 143 F.3d 1413 (11th Cir. 1998). *Miller* involved a claim by an ASCS County Executive Director that he was removed from his position because of his political beliefs. The court considered a split between the Eighth and Ninth Circuits and found the reasoning of the Ninth Circuit in *Moore v. Glickman,* 113 F.3d 988 (9th Cir. 1997), to be the more persuasive. In *Moore,* the court held that ASCS county staffers were precluded from asserting a *Bivens* action in light of Congress' express exclusion of the positions from full employment rights and explicit recognition of their "non-employee" status, as well as the availability of a statutory remedy under the APA. *Moore,* 113 F.3d at 992-94 (citing 7 U.S.C. § 6932(e)(1)). Relying on that reasoning, the Eleventh Circuit held that

15

> [t]he ample evidence . . . that Congress has not only recognized ASCS county
> staffers' unique status (i.e., that they are outside the protections of the CSRA)
> but has also acted to grant such workers only selective employment rights,
> only strengthens the necessary conclusion under our circuit's precedents that
> Miller may not seek a judicially-created damages remedy for violations of his
> rights during the course of his termination.

*Miller*, 143 F.3d at 1416.

Placed in the context of these decisions, plaintiff's *Bivens* claims arising out of their

removal from office through the USDA administrative process are clearly precluded by the

APA, 5 U.S.C. §§ 551-706. Although distinguishable from *Miller* because plaintiffs were

elected officers rather than employees of the Farm Services Agency, the court is satisfied

that the reasoning of *Miller* applies with equal force to the plaintiffs in this case—especially

in light of the Supreme Court precedent relied upon by the *Miller* court. Similar to the

county staffer position at issue in *Miller,* plaintiffs McGee and Lashley held unique positions

for which Congress has provided only selective employment rights. Also like the plaintiff

in *Miller,* plaintiffs here have a statutory remedy available to them via federal court review

of the USDA's decision. The court therefore holds that Congress has not "inadvertently"

limited the plaintiffs McGee and Lashley to an incomplete remedy under the APA. Because

the plaintiffs are entitled to an APA review of their claims, their *Bivens* action for money

damages is precluded.

## B.    Administrative Procedure Act

Plaintiffs also seek review of the decision to remove them from office pursuant to the

Administrative Procedure Act (APA). As noted earlier, agency actions should be reversed

under the APA only if they are found to be "arbitrary and capricious, an abuse of discretion,

16

or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agency actions must be reversed as arbitrary and capricious when the agency fails to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83 S. Ct. 239, 9 L. Ed. 2d 207 (1962)); *see also Florida Power & Light Co. v. FERC*, 598 F.2d 370, 380 (5th Cir. 1979). The scope of the court's review is "narrow"; the court should "not . . . substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43, 103 S.Ct. at 2866. Agency action must be presumed valid and rejected only for "'substantial procedural or substantive reasons . . . not simply because the court is unhappy with the result reached.'" *Manasota-88, Inc. v. Thomas*, 799 F.2d 687, 691 (11th Cir. 1986) (quoting *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 558, 98 S. Ct. 1197, 1219, 55 L. Ed. 2d 460 (1978)).

After a careful and searching review of the administrative record, the court is satisfied that the agency's decision to remove plaintiffs McGee and Lashley from office and bar them from future service was not arbitrary and capricious or an abuse of discretion under controlling principles of law. The court is not entirely happy with this conclusion but, as noted, the fact that the court might have reached a different conclusion forms no basis for a finding that would reverse the decision of the administrative agency. There are a number of troubling aspects of the administrative record. For example, there is some evidence that the FSA state executive committee failed to consider certain USDA directives

and administrative decisions regarding the responsibilities of county committees in the allocation of disaster relief. Additionally, the circumstances surrounding the repeated investigations of plaintiffs McGee and Lashley raise an inference of impropriety, especially in light of the existing ambiguity regarding the identifies of the persons who recommended each successive investigation and why those recommendations were made. Finally, the decision by Wardell Townsend was, in the court's view, fundamentally flawed in several respects. First, although Townsend declared that the evidence regarding church burnings and other acts of racial hostility was not relevant to his determination, he does not explain its inclusion, and apparent consideration, in his decision and seems to affirmatively rely on it in finding an atmosphere of racial hostility Greene County. In addition, the Townsend decision attributes certain racially tinged comments to plaintiffs despite the fact that the identities of the speakers of some of the statements were not established. It is also manifest that some of Townsend's statements comparing Mr. Hall's treatment with the treatment of white farmers were factually incorrect.[9]

---

[9] Mr. Townsend's decision was, in a word, lamentable, relying as it did on unsupported claims that McGee had regularly used racial slurs in his conversations, that the burning of black churches in Greene County and the shooting into the home of a black judge somehow supported an inference of racial animus on the part of the plaintiffs here, and that the claim of Mr. Hall was the only disaster relief claim that was denied in 1994.

In his final decision for the department, the Deputy Administrator for Program Delivery and Field Operations Farm Service Agency, John W. Chott, Jr., found that one plaintiff, Mr. McGee, made two comments that had racial connotations: one in which he referred to a mostly black housing project as a "baby factory" and another when he commented that " . . . when a black person gets caught with his hand in the cookie jar, they holler discrimination and racist . . . " He found no evidence that Mr. Lashley had made any racial comments. Mr. Chott found that the burning of black churches in Greene County should play no role in the decision-making process regarding the charges against the plaintiffs here. He made no comment about the alleged shooting of a black judge's home but did correct Townsend's finding that no white farmer's application had been denied or reduced during the period in question.

Moreover, Mr. Chott found that Townsend had "partially misinterpreted" the sparse evidence regarding racial comments by McGee that "black citizens were generally irresponsible and could not handle financial matters." He noted that the comments were in reference to members of the Greene County Commission, four of whom were black; that the county had filed a petition in bankruptcy; and that a grand jury had recommended that the members of the commission be impeached.

18

Nonetheless, the final decision to remove plaintiffs from office will be affirmed. This determination rests heavily on the final decision made in the administrative process by defendants Chott and Stencel—a decision which, in the court's opinion, had the effect of curing the numerous defects in the lower administrative proceedings. It is abundantly clear that hearing officer Chott reviewed the allegations against McGee and Lashley carefully and independently and arrived at his own conclusion regarding their conduct. The hearing before Chott lasted a full day and plaintiffs, through counsel, were given a full and fair opportunity to testify, call witnesses, and submit evidence into the record. Perhaps most importantly, Chott specifically discounted the troubling aspects of the Townsend decision noted above, highlighting the flaws in Townsend's articulation of the evidence and the bases for his decision.

> Most important, Chott specifically found, on adequate evidence, that:
>
> [T]here is a direct comparison between the two white farmers and Hall, who all filed for disaster payments, due to wet weather affecting their hay crops. Hall, whose application indicates he did apply the amount of fertilizer recommended by the Agricultural Extension Service, received reduced payments; the two white farmers applied no fertilizer, received no reductions, and were paid for the amount of disaster loss they claimed.

Without adequate explanation, this disparity in treatment between Mr. Hall and the two white farmers serves to establish a *prima facie* case of race discrimination. Moreover, based upon adequate evidence, Chott discredited the plaintiffs' explanation for their different treatment of Hall. Thus, the evidence of record supported a finding of discrimination by plaintiffs in the handling of George Hall's application for disaster benefits.

The court must also address the proportionality of the corrective action taken by the agency given the findings made by hearing officer Chott. As noted above, the court is not convinced that the most compelling case was made against plaintiffs McGee and Lashley during the administrative proceedings. Removal from office, then, might seem to be a disproportionate response to the allegations. Because plaintiffs held positions about which the public's perceptions regarding impartiality and integrity are of paramount concern, however, the court finds the decision of the agency to be not entirely unreasonable. Stated another way, the court finds a "rational connection between the facts found and the choice made." *Burlington Truck Lines,* 371 U.S. at 168. Hearing officer Chott applied the factors set out in *Douglas v. Veterans Administration,* 5 M.S.P.B. 313 (1981), and concluded that "the penalty of removal and the bar to future service with FSA are not outside the bounds of reasonableness." (Chott recommendation at 17). Although this court, if faced with the same determination, might have come to a different conclusion, it may "not . . . substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43, 103 S.Ct. at 2866.[10]

After careful review of the administrative record the court must conclude that the agency's final decision regarding plaintiffs McGee and Lashley was not arbitrary and

_____

[10]In modern America credible allegations of racial discrimination must be treated with the utmost respect and seriousness. The earnestness with which the courts view such allegations carries with it a concern that persons accused of engaging in racial discrimination not lightly be officially labeled as racists. In the view of this court, the circumstances here present are only minimally acceptable to justify the action taken by the USDA against these plaintiffs. One can only wonder how future county committee members will approach decisions regarding claims by farmers who, receiving an adverse decision, either real or perceived, may then accuse the committee members of discrimination.

capricious, an abuse of discretion, or otherwise not in accordance with law. The agency's

decision will be affirmed under 5 U.S.C. § 706(2)(A).

## C.  42 U.S.C. § 1981

In addition to their claims under the Administrative Procedure Act, plaintiffs assert

a claim under 42 U.S.C. § 1981, which provides that

> All persons within the jurisdiction of the United States shall have the same
> right in every State and Territory to make and enforce contracts, to sue, be
> parties, give evidence, and to the full and equal benefit of all laws and
> proceedings for the security of persons and property as is enjoyed by white
> citizens, and shall be subject to like punishment, pains, penalties, taxes,
> licenses, and exactions of every kind, and to no other.

Section 1981 liability must be founded on purposeful discrimination. *See General Bldg.*

*Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 389, 102 S. Ct. 3141, 3149, 73 L. Ed. 2d 835

(1982); *Lincoln v. Board of Regents of Univ. System of Ga.*, 697 F.2d 928, 935 n. 6 (11th Cir.

1983).

As an initial matter, the court must determine whether plaintiffs' claims under 42

U.S.C. § 1981 may proceed in light of the general rule that Title VII, 42 U.S.C. §2000e *et seq.*,

provides the sole remedy for claims of discrimination in federal employment. *See Brown*

*v. GSA*, 425 U.S. 820, 96 S. Ct. 1961, 48 L. Ed. 2d 402 (1976). Defendants argue that FSA

county committee members are substantially similar to federal employees and should

therefore be subject to the exclusivity rule of *Brown*. The court disagrees. The parties do

not dispute that plaintiffs are not employees of the federal government or one of its

agencies. Defendants' argument that plaintiffs' positions are "so similar to employment that

the same statutory framework should be applied to them as is to federal employees in the

21

employment discrimination context" makes little logical sense because plaintiffs McGee and Lashley, precisely *because of* their non-employee status, cannot avail themselves of the statutory protections of Title VII. In direct contradiction to the reasoning of *Brown,* precluding plaintiffs' § 1981 claim would effectively deprive them of any statutory remedy outside the APA.

It is well established in the Eleventh Circuit that the United States has not waived its immunity to suit under the civil rights statutes, including § 1981. *United States v. Timmons,* 672 F.2d 1373 (11th Cir. 1982); *Unimex, Inc. v. United States Department of Housing and Urban Development,* 594 F.2d 1060 (5th Cir. 1979); *Penn v. Schlesinger,* 490 F.2d 700 (5th Cir. 1973), *rev'd on other grounds,* 497 F.2d 970 (5th Cir. 1974) (en banc); *cert. denied,* 426 U.S. 934, 96 S. Ct. 2646, 49 L. Ed. 2d 385 (1976). Therefore, the § 1981 claims against the USDA and the USDA Farm Services Agency, as well as any claims against the individual defendants in their official capacities, are due to be dismissed.

The individual defendants assert that they are entitled to qualified immunity from individual liability, which would require dismissal of plaintiffs' § 1981 claims against them. The Eleventh Circuit has made clear that qualified immunity is a valid defense to a claim under 42 U.S.C. § 1981. *Johnson v. City of Fort Lauderdale,* 126 F.3d 1372, 1378 (11th Cir. 1997). Qualified immunity is applicable only to claims for monetary relief made against public officials acting in their individual capacities—in this case, it may apply to the claims against defendants Springer, Day, Mauldin, Petrey, Dawson, Chott, Townsend, and Stencel.

"Qualified immunity protects government officials performing discretionary functions from civil trials (and the other burdens of litigation, including discovery) and from liability

22

if their conduct violates no 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Lassiter v. Alabama A & M Univ.*, 28 F.3d 1146, 1149 (11th Cir. 1994) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). A right may only be clearly established where "the contours of the right [are] sufficiently clear [so] that a reasonable official . . . understand[s] that what he is doing violates that right." *Cofield v. Randolph County Comm'n*, 90 F.3d 468, 470 (11th Cir. 1996). Qualified immunity almost always protects government actors; "only in exceptional cases will [they] have no shield against claims made against them in their *individual capacities*." *Lassiter*, 28 F.3d at 1149 (emphasis in original). In fact, qualified immunity almost always applies to damages claims, but as the Eleventh Circuit has noted, "the defense is a narrow one, leaving plaintiffs other avenues of relief." *Id.* at 1149 n. 2. A plaintiff may bring a claim for damages against government actors in their official capacity absent sovereign immunity or may seek injunctive relief. *Id.*

The Eleventh Circuit has established a two-part analysis for qualified immunity claims. The initial burden is on the public official to establish, at the time of the occurrence of the matters complained of, that he was acting within the scope of his discretionary authority. *Zeigler v. Jackson*, 716 F.2d 847, 849 (11th Cir. 1983). Then, in order to impose liability upon defendant government officials, the plaintiff must establish the absence of objective good faith by demonstrating that "the official's alleged misconduct was 'objectively unreasonable' in that it violated clearly established law." *Schopler v. Bliss*, 903 F.2d 1373, 1380 (11th Cir. 1990) (quoting *Harlow*, 457 U.S. at 818). "For qualified immunity to be surrendered, pre-existing law must dictate, that is truly compel (not just suggest or

allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what the defendant is doing violates federal law in the circumstances." *Lassiter*, 28 F.3d at 1150.

As already discussed, according to plaintiffs, the individual defendants investigated and ultimately removed them from office on the basis of their race. Defendants suggest that it is not clearly established that these actions constituted violations of plaintiffs' rights. In most cases, standards with the requisite specificity are not available, and the qualified immunity defense applies. This is one of the rare situations, however, where, given plaintiff's version of the facts, case law makes it clear that the actions taken may be violations. It is clear that by the time the actions giving rise to the plaintiff's claims occurred, the right to be free from racial discrimination under 42 U.S.C. § 1981 was "clearly established" in the Eleventh Circuit. *See, e.g., Lincoln v. Board of Regents of Univ. System of Ga.*, 697 F.2d 928 (11th Cir. 1983); *Johnson v. Railway Express Agency*, 421 U.S. 454, 459-60, 95 S. Ct. 1716, 44 L. Ed. 2d 295 (1975). The proper standard was well-known as well, and tracks the analogous standard of Title VII. *See Patterson v. McLean Credit Union*, 491 U.S. 164, 186, 109 S. Ct. 2363, 2377-78, 105 L. Ed. 2d 132 (1989). Hence, if, as plaintiffs McGee and Lashley allege, defendants Springer, Day, Mauldin, Petrey, Dawson, Chott, Townsend, and Stencel violated their rights under § 1981, they unquestionably would not be immune from civil liability in their individual capacities. *See Johnson v. City of Fort Lauderdale,* 126 F.3d 1372, 1378 (11th Cir. 1997).

Defendants' focus on the objective specifics of their conduct misses the central question. The focus must be not on *what* defendants did, but *why* they did it. If the

24

disciplinary action against the plaintiff was done for racially discriminatory reasons, as alleged by the plaintiffs, the persons responsible for taking that action clearly violated the plaintiffs' rights to be free of racial discrimination and may be held liable under § 1981. They would not be entitled to qualified immunity. The Eleventh Circuit has directed courts to make this assessment of intent in deciding the question of qualified immunity. "A government actor, however, cannot violate a plaintiff's equal protection rights unless the defendant has the intent to discriminate. Concomitantly, the actor cannot know he is violating clearly established equal protection rights unless he harbors discriminatory intent. Thus, even though intent is not "conduct" per se, a district court must make a determination regarding intent as part of the first prong of its qualified immunity inquiry." *Mencer v. Hammonds*, 134 F.3d 1066, 1070-71 (11th Cir. 1998) (citations omitted). The court has also cautioned that the causation defense created by *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274 (1997) must be considered in assessing defendants' intent. *Foy v. Holston*, 94 F.3d 1528 (11th Cir. 1996).[11] Thus defendants are entitled to immunity (and indeed even without immunity to victory on the § 1981 claims, at least at the summary judgment stage), if plaintiffs ultimately cannot establish a racially discriminatory motive for their actions, or if defendants can prove that they would have taken the actions even in the absence of that improper motive.

---

[11] To the extent that *Foy* requires a court to shift the balance of proof on a *Mt. Healthy* defense in defendants' favor, or to rely on an objective assessment of the possible reasons for defendants' conduct, its precise holding may be called into question by the Supreme Court's recent decision in *Crawford-El v. Britton*, 118 S. Ct. 1584 (1998). The court need not reach this question, however, because the factual situation before it is relatively clear-cut and the nuances of *Foy* are therefore not outcome determinative.

At this stage of the proceedings, the court does not feel that the individual defendants are entitled to be dismissed on the basis of qualified immunity. At a later date—for example, at the summary judgment stage—the court may have occasion to evaluate the evidence about each defendant to determine whether there exists any evidence of discriminatory motive. At present, however, the defendants simply have not demonstrated that "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S. Ct. 99, 101-02, 2 L. Ed. 2d 80 (1957). Therefore, the motion to dismiss is due to be denied as to the plaintiff's claims against the individual defendants in their individual capacities under § 1981.

Defendants also claim that hearing officer Chott is entitled to absolute judicial immunity under the rule set forth in *Butz v. Economou,* 438 U.S. 478, 512-13, 98 S. Ct. 2894, 2914-15, 57 L. Ed. 2d 895(1978) ("adjudication within a federal administrative agency shares enough of the characteristics of the judicial process that those who participate in such adjudication should also be immune from suits for damages"). The court agrees. Hearing officer Chott clearly acted in an adjudicatory role by hearing evidence from the parties and resolving a dispute between them. The court has considered plaintiffs' argument that Chott acted in a prosecutorial, rather than judicial, manner and has found it entirely unpersuasive.

### D.    42 U.S.C. § 1985(3)

In section IV.B of their complaint, plaintiffs assert a claim pursuant to 42 U.S.C. § 1985(3). Established by the Civil Rights Act of 1871, that section provides that if one or more persons engaged in a conspiracy as defined in § 1985 "do, or cause to be done, any act in

furtherance of the object of such conspiracy, whereby another is injured in his person or property, . . . the party so injured . . . may have an action for the recovery of damages occasioned by such injury . . . against any one or more of the conspirators." 42 U.S.C. § 1985(3).

As noted earlier, the United States has not waived its immunity from suit under the provisions of the civil rights statutes. *See* Section III.C., *supra.* Therefore, the § 1985(3) claims against the USDA, the USDA Farm Services Agency, and the individual defendants in their official capacities are due to be dismissed. Also, for the reasons noted above, defendant Chott is entitled to absolute judicial immunity because of his role in the administrative proceedings. Under Eleventh Circuit law, however, governmental defendants in § 1985(3) actions are not entitled to assert qualified immunity from suit. *Burrell v. Board of Trustees of Georgia Military College,* 970 F.2d 785, 793 (11th Cir. 1982); *Johnson v. City of Fort Lauderdale,* 126 F.3d 1372, 1378 (11th Cir. 1997). Thus, the claims against the individual defendants in their individual capacities must survive the motion to dismiss.

## E.     Defamation

Finally, plaintiffs attempt to state a claim of defamation against the defendants for "falsely and maliciously accus[ing] plaintiffs of burning black churches in Greene County and of shooting into the house of a black judge." (*Complaint* at ¶ 30). Pursuant to the Liability Reform Act, the exclusive remedy for a defamation claim against federal employees acting within the scope of their government employment is under the Federal

27

Tort Claims Act (FTCA).[12] Defamation claims are explicitly excluded under the FTCA. 28 U.S.C. § 2680(h). Accordingly, the government has not waived its immunity to such actions and plaintiffs' defamation claim is due to be dismissed. See generally *Nadler v. Mann*, 951 F.2d 301 (11th Cir. 1992).

## IV.    Conclusion

For the reasons set forth above, the defendants' motion to dismiss and/or motion for summary judgment and/or for administrative review, filed on March 2, 1998, will be granted in part and denied in part. A separate judgment, consistent with this opinion, will be entered.

Done, this ___7th___ of April, 1999.

EDWIN NELSON
UNITED STATES DISTRICT JUDGE

---

[12]Title 28, Section 2679(b)(1) of the United States Code provides:

The remedy against the United States provided by [the FTCA] for injury or death arising or resulting from the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment is exclusive of any other civil action or proceeding for money damages by reason of the same subject matter against the employee whose act or omission gave rise to the claim or against the estate of such employee. Any other civil action or proceeding for money damages arising out of or relating to the same subject matter against the employee or the employee's estate is precluded without regard to when the act or omission occurred.